UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| KAMI L. KUHLE, | ) | CIV.  05-05062-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE |
| | ) | COMMISSIONER'S DECISION |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Kami L. Kuhle, moves for reversal of the Commissioner of

Social Security's decision denying her application for disability insurance

benefits under Title II of the Social Security Act.  Defendant opposes the

motion.  The court affirms the Commissioner's decision denying benefits.

**PROCEDURAL HISTORY**

Kuhle filed an application for disability insurance benefits on

January 23, 2003, alleging disability since October 23, 2002, due to a

herniated thoracic disc and chronic back and leg pain.  (Tr. 116, 144).  Her

application was denied initially and upon reconsideration.  (Tr. 28-29, 42-

47).

On April 1, 2004, a hearing was held in Rapid City, South Dakota, at

which Kuhle testified.  (Tr. 541).  A supplemental hearing was held on

April 22, 2004, at which Kuhle, as well as vocational expert Margot Burton and psychological expert James Simpson testified.  (Tr. 577-597).  On August 17, 2004, Administrative Law Judge (ALJ) Larry Donovan issued an unfavorable decision, (Tr. 33-40), which was later vacated and remanded by the Appeals Council for further proceedings.  (Tr. 86-89).

On April 27, 2005, a new hearing was held in Rapid City, South Dakota, at which Kuhle testified, as well as psychological expert Michael Enright, Ph.D., and vocational expert Jerry Gravatt.  (Tr. 598-634).  The ALJ issued a second unfavorable decision on June 6, 2005, finding that Kuhle was not disabled under the Social Security Regulations.  (Tr. 15-26).  On June 16, 2005, Kuhle filed a request for review with the Appeals Council which was denied on July 25, 2005.  (Tr. 10-11, 7-9).  This action followed.

## FACTS

Kuhle was born on February 27, 1971.  (Tr. 153).  She has worked as a chiropractic assistant, a salesperson, a merchandiser, and a flower arranger.  (Tr. 145).  As a chiropractic assistant Kuhle worked for 6 months for 6-8 hours per day, 4-5 days per week for $8 per hour.  As a salesperson for Sally Beauty Supply, Kuhle worked for 1 month for 8 hours per day, 4-5 days per week at $7 per hour.  As a merchandiser, Kuhle worked 6 hours per day, 2-3 days per week for $6 per hour.  As a salesperson for BH Posse, Kuhle worked 4-6 hours per day, 2-3 days per week for $5.75 per hour.

Kuhle worked as a flower arranger for 11 months.  She created flower arrangements, took orders and sales, cleaned flowers, and made deliveries. She did this for 8 hours per day, 5-6 days a week for $6.75 per hour.  She has a high school equivalent education and special training as a medical secretary.  (Tr. 150).  She is married with three children who were 7, 9, and 11 at the time of the first hearing.  (Tr. 545).

**Medical History**

On the alleged onset date of her disability, October 23, 2002, Kuhle was 31 years old.  (Tr. 116).  She began suffering from back pain and was hospitalized at Rapid City Regional Hospital.  (Tr. 404-475).  Kuhle was examined by Kevin Weiland, M.D.  She described low-grade back discomfort and pain.  A week before, Dr. Lecy, her chiropractor, had treated her pain with back manipulation but when the pain continued and intensified, she went to the emergency room.  She told Dr. Weiland that she could lay in some positions, but in others she experienced excruciating pain.  Dr. Weiland noted that Kuhle had a history of depression and insomnia which had been stable.  (Tr. 445).

Kuhle was also examined at Rapid City Regional Hospital by Robert MacLachlan, M.D.  He noted that she had a full range of motion in all four extremities and full upper and lower extremity strength.  An MRI scan of Kuhle's cervical thoracic spine showed evidence of a midline disk protrusion

at the T8-T9 level which was contracting the anterior cord.  He noted that there was no significant spinal stenosis (narrowing) at that level. Dr. MacLachlan noted that Kuhle's neurological examination was without evidence of cortical spinal tract dysfunction.  He concluded that the level of the disk herniation corresponded to the level of Kuhle's back pain and was most likely responsible for her pain.  (Tr. 449-50).  Kuhle was discharged on October 29, 2002, with instructions to avoid all lifting, bending, or squatting for two weeks.  (Tr. 412).

On October 30, 2002, Kuhle was examined by Dr. Edward Seljeskog. He noted that Kuhle complained of back pain that intensified with physical activity.  After reviewing her MRI, he concluded that her symptoms were related to the thoracic disk herniation.  Dr. Seljeskog fitted her with a thoracolumbar corset and expressed his hope that Kuhle could avoid surgery since an operation in the thoracic area is "more of a significant undertaking."  (Tr. 310).

Kuhle was again examined by Dr. Seljeskog on November 4, 2002.  He reported that her symptoms had worsened during the weekend, but that she was now "somewhat better."  After discussing possibilities of surgery with Kuhle, Dr. Seljeskog noted that she understandably wished to avoid surgery if possible.  (Tr. 309).

-4-

Dr. Seljeskog saw Kuhle again on November 21, 2002, and observed mild degenerative changes.  Dr. Seljeskog recommended proceeding with diskectomy surgery at the T8-9 level.  (Tr. 308).

Kuhle underwent the microdiskectomy at the T8-9 level on November 25, 2002.  On December 2, 2002, she was examined by Dr. Seljeskog.  He reported that her "previous and intractable back pain seems to have completely resolved."  He instructed her to resume her regular medications which included Prozac and Trazodone.  (Tr. 211).  She was again examined on December 5, 2002, and told Dr. Seljeskog that her back pain was "much better at this point" but that she still had some tenderness and burning in her muscles near the incision as well as some leg discomfort.  Dr. Seljeskog observed her gait and station and found them normal.  (Tr. 306).

Kuhle was seen by John R. Fox, M.D., on December 9, 2002.  Dr. Fox noted she experienced considerable discomfort from the thoracic disc surgery and that her Prednisone made her anxious, dysphoric, and interfered with her sleep.  (Tr. 490).

On December 17, 2002, Dr. Seljeskog saw Kuhle and noted she had satisfactory early recovery from the thoracic disc herniation.  She still experienced vague pain in her legs, but had only modest back pain.

Dr. Seljeskog recommended Kuhle begin physical therapy for her lower extremities.  (Tr. 305).

Dr. Seljeskog saw Kuhle on January 14, 2003.  He noted that Kuhle experienced some muscular discomfort in the operative area, but that she has been able to work on a light duty basis.  He observed that she moved about quite readily, appeared comfortable and was neurologically normal. (Tr. 304).

In a visit to Dr. Seljeskog on January 30, 2003, Kuhle's symptoms continued despite the physical therapy.  She had returned to work, but was "finding it difficult to cope."  She was also experiencing vague symptoms involving her lower extremities.  (Tr. 303).

Dr. Ronald Baxter, evaluating an MRI taken on February 6, 2003, noted a small amount of residual disk but concluded that this did not appear to be causing more than a minimal indentation on the cord.  There was no significant foraminal narrowing.  At the T8-9 level, there were no recurrent disk herniations and no residual cord compression.  (Tr. 275). Dr. Seljeskog analyzed the same MRI study and found it "quite unremarkable."  He noted a small disk abnormality at T7-T8, recommended more physical therapy and continued her on Vicodin.  (Tr. 302).

On March 10, 2003, Kuhle visited Stephen Eckrich, M.D., for her back pain which was "persistent despite surgical intervention."  She

reported that she had developed significant pain going down into both of her legs and had midthoracic back pain.  She stated to Dr. Eckrich that her surgery "did not help the pain at all and if anything it seems to be worse now than what it was before surgery." Her pain was worse with standing and physical therapy and was better when she took pain pills.  Upon examination, Dr. Eckrich noted she was in moderate stress as she moved and commented,

> I am at a loss as to explain the constellation of symptoms of which she is currently complaining. The postoperative MRI does show that the small disk herniation which was present is now gone.  I told her that unless there was some injury to the cord itself with the manipulation from the surgery that I cannot explain her leg pain based upon what we see on the MRI.  (Tr. 323).

State agency physician F.R. Entwistle, M.D., reviewed Kuhle's records on March 11, 2003.  He found she could lift 20 pounds occasionally and 10 pounds frequently and that she could stand and/or walk about 6 hours in an 8-hour workday.  He found no other limitations.  (Tr. 200-05).  Kuhle's records were also reviewed by Larry Vander Woude, M.D., in July 2003.  He agreed with Dr. Entwistle's findings and found no other limitations.  (Tr. 190-97).

On March 20, 2003, Kuhle visited Mark J. Simonson, M.D., for her thoracic pain.  She reported that she experienced pain in her thighs,

sometimes all the way down to her feet.  She took hydrocodone three to four times per day and 400 mg of ibuprofen a couple times per day.  This helped somewhat with no side effects.  Physical therapy aggravated her symptoms. She explained that she felt worse with prolonged standing, sitting, or lying down.  She treated her pain with hot packs, ice, traction, and a back brace, which helped.  Her medications also helped, but chiropractic treatment, strengthening exercises and a TENS unit made them worse.  Dr. Simonson noted she is moderately limited due to her pain.  Based on the degree of cord compression from her MRI report, Dr. Simonson stated he had difficulty understanding her symptoms in her lower extremities but thought perhaps the herniation was greater than reported on the imaging study. She was having limited benefit from medications, though the Neurontin helped.  Dr. Simonson prescribed a Lidoderm patch and recommended an epidural, but Kuhle was hesitant about injection.  Dr. Simonson concluded, "Otherwise, I do not have much further to offer her other than trial of a very gentle and cautious therapy approach once again."  (Tr. 293-94).

Dr. Simonson saw Kuhle again on March 28, 2003, and again noted he has very little to offer her.  She was very hesitant to proceed with trials of new medications, still did not want to try an epidural, and she did not want to take any more of the one medication that seemed to help, Neurontin, because it made her drowsy.  She did not want to do more physical therapy

because it aggravated her symptoms.  Dr. Simonson reiterated that he did not fully understand her problem.  He explained, "she reports a great deal of lower extremity symptoms that she did not have before surgery.  Her MRI apparently does not demonstrate any significant thoracic cord lesion at this time."  He recommended she have her imaging studies reviewed by another surgeon and arranged for her to see Dr. Schleusener and Dr. MacLachlan. (Tr. 292).

On April 1, 2003, Kuhle visited Dr. MacLachlan.  He reported her pain complaints are likely "multifactorial, musculoskeletal in etiology in addition to neuropathic, most likely from her spinal cord compression."  He prescribed Tegretol to help the neuropathic pain.  (Tr. 301).

On April 16, 2002, Kuhle visited Dr. Lecy, her chiropractor.  She complained of intermittent tingling, numbness, and burning or cold sensation in her index fingers and thumbs as well as stiffness in her neck. (Tr. 329).

Kuhle visited Dr. MacLachlan on April 25, 2003.  She had not started her Zanaflex because she was worried about potential associated fatigue. Dr. MaLachlan prescribed Tegretol and Ultram.  (Tr. 296-97).

In a questionnaire completed in conjunction with her orthopedic care in September 2003, Kuhle indicated her pain was severe without variance, that she could not stand for more than 10 minutes without pain, and that

washing and dressing increases her pain.  She responded she could not lift heavy weights, but could manage light to medium weights, could not sit for more than one-half hour and her pain was gradually worsening.  (Tr. 394).

On September 4, 2003, Kuhle was examined by Robert C. Suga, M.D. for her thoracic, arm, and leg pain.  Kuhle recounted her history to Dr. Suga and stated that after her surgery she was initially so drugged that she did not recall if she had any relief of symptoms.  When she stopped taking her pain medications she realized she still had pain in her back.  Dr. Suga noted she had a normal stance and gait.  He recommended she get cervical, thoracic, and lumbar MRI scans as well as a bone scan.  (Tr. 386-87).

After obtaining these tests, Kuhle returned to Dr. Suga on September 11, 2003.  Dr. Suga noted her bone scan showed mild increased uptake in the thoracic spine.  The thoracic scan showed degenerative disk change, but no major compressive pathology.  There was no sign of any cord involvement.  The cervical spine MRI showed mild degenerative disk disease, but was otherwise normal.  Dr. Suga recommended conservative management.  (Tr. 387).

On October 29, 2003, Kuhle saw K.C. Chang, M.D., who noted a small midline posterior disk herniation on the MRI.  The cervical MRI indicated multi-level degenerative disk changes, but otherwise was normal.  The MRI

of the lumbar spine indicated no abnormalities and the bone scan showed some diffuse uptake in the lower thoracic.

Dr. Chang noted Kuhle's continued chronic back pain and leg symptoms.  In addition, Kuhle complained of carpal tunnel syndrome.  Dr. Chang recommended an EMG nerve conduction study be done on Kuhle's extremities.  The EMG study returned normal.  Dr. Chang reported that a lot of Kuhle's condition in her muscles could be related to deconditioning.  Dr. Chang recommended more physical therapy.  (Tr. 366).

During Kuhle's physical examination, Dr. Chang reported a limited range of motion of her trunk and cervical spine.  Kuhle had positive Tinel's on both wrists, but hand grasps were at normal strength.  (Tr. 367).

On October 31, 2003, Kuhle saw neurologist Todd Zimprich, M.D.  Dr. Zimprich suspected Kuhle's symptoms were related to the trauma from surgery, possibly post-myelopathy syndrome and that she may be developing a generalized pain syndrome.  Kuhle related that she experiences headaches.  Dr. Zimprich recommended she restart Neurontin, stop the Ultram, and maximize her therapy.  (Tr. 481-82).  In a follow-up appointment on December 8, 2003, Dr. Zimprich conducted an extensive evaluation which was "essentially unremarkable."  Kuhle had tapered off some of her medicines, but still suffered from recurrent headaches.  (Tr. 477).

-11-

On November 6, 2003, Kuhle saw Dr. Chang.  Dr. Chang found electrical evidence indicating carpal tunnel syndrome.  He recommended a resting splint for her wrists at nighttime.  For her back, Dr. Chang recommended she continue her therapy program.  Kuhle returned to Dr. Chang on November 21, 2003, complaining of numbness in her hands. The splint was not helping.  She was experiencing neck, upper back, and lower back pain as well as headaches.  Dr. Chang recommended she continue with the therapy for her back and consider surgical intervention for her carpal tunnel.  (Tr. 338).  After a visit on December 19, 2003, Dr. Chang suggested to Kuhle the chronic pain clinic at McKennan Hospital. (Tr. 338).

On January 8, 2004, Kuhle was seen by Dr. Suga.  Though Kuhle had suffered severe back pain over the Christmas holiday, Dr. Suga found that she neurologically checked out well.  He found no cord involvement.  (Tr. 526).  Dr. Suga saw her again on January 22, 2004, and recommended she continue her therapy program.  (Tr. 526).

On March 5, 2004, Kuhle saw Amir A. Mehbod, M.D., for her back pain.  She explained that her pain is worse with activity and after sitting for long periods of time and is better with alternative positions.  Dr. Mehbod found she had no neurologic deficits and no myelopathy.  He reported that her pain is really coming from her discogenic problem at the T9-10 level,

though he could not exclude that at T10-11, T11-12, and T12-L1.  He recommended she continue with a nonoperative conservative approach with physical therapy, gave her a thoracolumbosacral orthosis (TLSO), and prescribed Celebrex.  (Tr. 486-88).

Kuhle underwent carpal tunnel release surgery on March 11, 2004. Dr. Blake Curd reported that her symptoms were totally relieved by the surgery and released her from any restriction whatsoever.  (Tr. 527-28).

In a letter to Kuhle's attorney dated April 1, 2004, Dr. Zimprich stated that he suspected her symptoms were predominantly musculoskeletal and that because of this, it makes sense that sustained position causes an increase in the back pain.  Therefore, movement and changing positions on a regular basis probably does improve her symptoms.  (Tr. 521).  On April 16, 2004, Kuhle called Dr. Zimprich's office and reported she is "doing well" on medication and having hardly any headaches.  (Tr. 522).

Kuhle saw Dr. Mehbod on April 30, 2004.  Dr. Mehbod concluded her back pain was caused by degenerative disks and recommended she use her brace whenever she has flare ups, use anti-inflammatory medication during flare ups, and avoid provocative activities.  If her quality of life is so limited that she wants to "have something done, then we can do discograms from T7-8, T8-9, T9-10, T10-11, T11-12, and T12-L1 until we get normal disks." (Tr. 538).

Kuhle saw Dr. Zimprich on July 20, 2004, and reported "relatively good control over her numerous pain symptoms."  She had an increase in neck pain in several regions, however, due to an accident when a child fell on her back and neck while swimming in the pool with her daughter.  She also had stiffness in her low back and radiating pain along her right thigh from her groin. Her headaches were under relatively good control. Dr. Zimprich noted her headaches were responding well to Verelan.  He recommended she continue the Verelan and prescribed Zomig and Skelaxin in conjunction with physical therapy.  (Tr. 523-24).

Kuhle saw Dr. Mehbod again on July 30, 2004.  He noted that the brace seems to have helped a little bit and the TLSO had helped a lot.  He went on, "her quality of life is being significantly affected by this back pain." He suggested continued conservative care with physical therapy and controlling the pain with medication or the brace.  (Tr. 539).

On October 29, 2004, Kuhle called Dr. Zimprich's office complaining of headaches.  She had not been wearing her brace.  Dr. Zimprich advised her to increase her Verelan and refilled her Zomig.  (Tr. 524).

**Hearing Testimony**

At the post-remand hearing held on April 27, 2005, Kuhle testified that she took care of her three children every other weekend, holidays, and summers.  (Tr. 602).  She also stated that she had gained weight since she

hurt her back.  (Tr. 603).  Her back was the main thing that kept her from working.  She could not wash dishes, she could only put them in the dishwasher before she had to sit down because her back burned.  (Tr. 607).

Kuhle testified that she has a body brace that she is supposed to wear, but since her stomach gets bloated with her different medications, the brace fits too tightly.  (Tr. 608).  She testified that her pain medication "takes the edge off" and that "it helps a lot" with her leg pain.  (Tr. 610).  She testified that she drove a car and took her kids to a water park during the summer.  (Tr. 612).  The longest she had driven was a five-hour trip to Lantry, South Dakota.  (Tr. 613).  She drove herself to Rapid City from Sioux Falls for the hearing.  (Tr. 617).

In describing her daily activities, Kuhle testified that she gets up between nine and eleven, depending on how she slept, then sits in her recliner with a heat pad and then either takes a hot bath or sits in the hot tub.  She reads a lot.  (Tr. 613).  When her kids are home, they help her make lunch.  In the afternoons, Kuhle testified she sometimes does not do anything because of her pain.  On other days she picks up a little, puts the dishes in the dishwasher, sits in her chair, or lies down on the couch.  She testified that she does not prepare dinner often, only one day a month.  In the evenings she would sit in her recliner and sometimes get up to walk around. She would go to bed around one to three in the morning and would

-15-

sleep for about five hours.  (Tr. 615-16).  She testified that she seldom did the food shopping or laundry, ate out only once in awhile, and she would go to church about once a month.  (Tr. 617).

Kuhle described that she could only sit for a half-hour or 45 minutes. If she can move around, she testified that she could stand for 15 minutes and could walk around the block.  She could safely lift 5 pounds.  (Tr. 619).

Dr. Michael Enright, a clinical psychologist, testified that Kuhle had a memory disorder and a history of depression, neither of which met the listings criteria.  He testified that there would be no limitations in the workplace from mental health.  (Tr. 625-26).  Dr. Enright agreed that nothing in Kuhle's record indicated malingering or overstating.  (Tr. 627).

Vocational expert Jerry Gravatt was presented with a hypothetical person who was limited to the exertional requirements of the sedentary level, needed to alternate between sitting and standing and/or walking, should never climb ladders, ropes, or scaffolds, and could only occasionally stoop or kneel.  The person could not reach or lift above the shoulder level and could not work in an environment of extreme cold, dampness, humidity, or vibration.  Gravatt testified that this person would not be able to do Kuhle's previous work, but that there are some positions which exist in significant numbers in the national or regional economy.  Some examples include semiskilled, sedentary positions, such as telephone answering or a

receptionist.  Gravatt further testified that if a hypothetical worker needed to be away from the workplace more than an hour and a half per day to lie down, no jobs would exist.  (630-31).

On cross-examination, Gravatt explained that a worker who could not sit still for 45 minutes to an hour or must have unpredictable breaks would not be employable. If an individual could sit for 15 to 20 minutes, then stand for 15, then walk for 10 throughout the day, the person would also not be employable.  (Tr. 632-33).

**ALJ Decision**

In order to determine whether Kuhle is disabled, the ALJ applied the sequential five-step evaluation process.[1]  At the first step he found that Kuhle was not performing substantial gainful work.  At the second step the ALJ determined that Kuhle suffered from chronic pain that is "severe." Third, the ALJ found that Kuhle's impairments do not meet or medically

---

[1]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  See Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

equal one of the impairments listed in the regulations.  Fourth, the ALJ

analyzed Kuhle's residual functional capacity (RFC) and found that Kuhle's

allegations regarding her limitations are not totally credible.  He found that

Kuhle retains the RFC to perform sedentary level work, but needs to

alternate between sitting and standing and/or walking, should never be

required to climb ladders, ropes, or scaffolds, can occasionally stoop and

kneel, should not be required to reach or lift above the shoulder, should not

work in extreme cold, dampness, or humidity, or vibration, and should not

be subjected to hazards.  Due to these limitations, the ALJ found Kuhle

could not perform her past relevant work.  At the fifth step, the ALJ found

that Kuhle is a "younger individual" with a "high school equivalent

education" and special training as a medical secretary.  He found that

though Kuhle could not perform the full range of sedentary work, there are

a significant number of jobs in the national economy she could perform,

such as telephone answerer and a receptionist.  The ALJ concluded Kuhle is

not disabled under the Social Security Act.

**STANDARD OF REVIEW**

The decision of the ALJ must be upheld if it is supported by

substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Metz v.

Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than

a preponderance but enough evidence that a reasonable mind might find it

adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under § 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  See also Smith v. Shalala, 987 F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith v. Sullivan, 982 F.2d

at 311; <u>Satterfield v. Mathews</u>, 483 F. Supp. 20, 22 (E.D. Ark. 1979), <u>aff'd per curiam</u>, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. <u>Smith v. Shalala</u>, 987 F.2d at 1374.

## DISCUSSION

Kuhle claims the ALJ's rejection of Kuhle's subjective complaints of pain is not supported by substantial evidence.  Relying on <u>Polaski v. Heckler</u>, 751 F.2d 943 (8th Cir. 1984), Kuhle argues that an ALJ may only discount subjective complaints of pain if there are inconsistencies in the evidence as a whole. <u>Polaski</u>, 751 F.2d at 948.  In making such an evaluation of pain or other subjective symptoms, <u>Polaski</u> held that an ALJ must consider the following factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. <u>Polaski</u> at 949.

The court will not disturb the decision of an ALJ who seriously considers, but for good reason expressly discredits a claimant's subjective complaints, if those reasons are supported by substantial evidence in the record as a whole.  <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999).

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts, but such assessments must be based upon substantial evidence.  See Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).  In rejecting subjective complaints, the ALJ must make express credibility determinations and set forth the inconsistencies on the record.  The ALJ must not only show that the record contains inconsistencies, but that he considered all the evidence relevant to the claimant's complaints under the Polaski standards.  Id.

An ALJ "need not explicitly discuss each Polaski factor.  It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints."  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (citation omitted).  See also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding an ALJ need not methodically discuss each Polaski factor, but the factors must be acknowledged and examined).

The ALJ found that Kuhle's statements concerning her impairments and the impact of those impairments on her ability to work were "considerably more limited and restricted than is established by the medical evidence, her own statements to treating sources, and medical source opinions."  (Tr. 22).  The ALJ articulated several reasons for this finding.  First, in April 2004, Kuhle reported to Dr. Zimprich that she has had relatively good control over her pain symptoms since her last visit.  Second,

-21-

Kuhle's description of her daily activities indicated she has abilities that "are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." Third, the record suggests her symptoms were relieved by surgery. Fourth, her description of pain "has been so extreme as to appear implausible, especially since they are without documentation of significant findings." This includes a finding that no physician submitted that she was disabled. The ALJ also found her description of pain less credible based on her testimony that she drove to her hearings in Rapid City from Sioux Falls, South Dakota. Fifth, the ALJ found that Kuhle forgot and refused to take medication, "suggesting that her symptoms may not have been as serious as [Kuhle] alleged." In addition, although she was evaluated for the chronic pain program, as of the date of her hearing, Kuhle had not submitted that she had started it. (Tr. 22-23). The court will discuss each of these findings separately.

## 1.    Pain Under "Relatively Good Control"

The ALJ must make the credibility assessments in the first instance and may discount subjective complaints if there are inconsistencies in the evidence as a whole. Smith v. Heckler, 760 F.2d 184, 187 (8th Cir. 1985). The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

Here, the record contains statements made by Kuhle to her doctors which sometimes indicate severe pain and other times that her symptoms have improved or her pain has subsided. On December 2, 2002, after her surgery, Dr. Seljeskog reported her pain "completely resolved." (Tr. 211). On December 5, 2002, Kuhle stated her back pain was "much better." (Tr. 306). On December 17, 2002, she reported modest back pain. (Tr. 305). On March 10, 2003, she reported her pain was worse than before her surgery. (Tr. 323). In April 2003, she reported her pain was severe without variance. (Tr. 394). On November 21, 2003, Kuhle complained of upper and lower back pain and headaches. On December 8, 2003, Dr. Zimprich noted Kuhle had tapered off some of her medicines, but she still suffered from headaches. (Tr. 477). On January 8, 2004, she reported severe pain over the holiday. (Tr. 526). On March 5, 2004, she described her pain as worse with activity. (Tr. 486). On April 16, 2004, in a phone call to Dr. Zimprich's office she reported she is doing well on medication and had hardly any headaches. (Tr. 522). On July 20, 2004, she reported "relatively good control over her numerous pain symptoms." (Tr. 523).

When a claimant makes inconclusive or inconsistent statements, a determination of the claimant's credibility is warranted. See Masterson, 363 F.3d at 738-39. The ALJ considered the entire record and determined that Kuhle's statement to her treating physician that she had her pain under

-23-

"relatively good control" was inconsistent with her other complaints of chronic pain.  Because the ALJ is in the best position to make determinations which require consideration of the entire record, the court must defer to his findings.

**2.     Daily Activities**

In support of his determination that Kuhle's daily activities were inconsistent with her complaints of pain, the ALJ cited Kuhle's testimony that she took care of her personal needs, did some housework, did her exercises, took care of her children during the summer and on weekends, and visited with relatives.  In particular, the ALJ noted that taking care of children "can be quite demanding both physically and emotionally."  (Tr. 22).

Inconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (where claimant's ability to care for one of his children daily, drive a car, and sometimes go to the grocery store was substantial evidence to support ALJ's rejection of subjective complaints of severe back pain).  The ALJ properly considered Kuhle's daily activities in the context of her subjective complaints of pain, as required by Polaski, and found her activities inconsistent with her complaints.

-24-

### 3.     Symptoms Relieved by Surgery

Although Kuhle reported relief from her symptoms in December 2002, immediately following her surgery, the record overwhelmingly indicates that her pain persisted during the years following.  The ALJ erred in relying on this singular statement to discredit Kuhle's later complaints of pain.

The ALJ, however, relied on more than just this one statement in discrediting Kuhle's subjective complaints of pain. The Eighth Circuit has stated it "will not set aside an administrative finding based on an arguable deficiency in opinion-writing technique when it is unlikely it affected the outcome." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)).  The ALJ in this case relied on several reasons for determining Kuhle's statements were not entirely credible and thus, this error is harmless.

### 4.     Implausible Descriptions of Pain With No Medical Documentation

When the medical evidence does not correlate to the magnitude of pain complained of, the absence of objective medical evidence is a factor in assessing a claimant's credibility. See Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989).  Here, although numerous documents recount Kuhle's complaints of pain, no physician was able to explain it.  The ALJ noted that Kuhle "was repeatedly referred by her physicians to other physicians when they were unable to document any significant findings."  He noted further,

"although [Kuhle] was examined by many physicians, none of them indicated that [Kuhle] was disabled and only Dr. Zimprich suggested that changing positions on a regular basis probably would improve her symptoms. However, no other physician listed restrictions."  (Tr. 22).

In further support of the ALJ's credibility determination, Kuhle's doctors continuously recommended conservative care, physical therapy, and medication.  Only Dr. Mehbod suggested surgery if Kuhle chose to undertake it, but in the meantime, he suggested she continue to use her brace, medication, and the TLSO, and to continue conservative care and physical therapy.  (Tr. 538-39).  Throughout the record her examining sources suggested physical therapy, (Tr. 305, 302), a gentle and cautious therapy approach, (Tr. 293-94), conservative management, (Tr. 387), more physical therapy, (Tr. 366, 338, 526, 523-24), a chronic pain clinic, (Tr. 338), a nonoperative conservative approach with physical therapy, (Tr. 486-88, 539), and that she avoid provocative activity, (Tr. 538).  See Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006) (holding the ALJ's determination that a claimant's complaints of back pain were not credible was further supported by evidence that no doctors recommended surgery but instead recommended exercise and medication).

Additionally, the ALJ did not merely rely on the lack of medical evidence in making his credibility determination. The ALJ's reliance on

several factors in consideration of the evidence as a whole constitutes
substantial evidence to support his determination.

**5.      Refusal of Medication; No Initiation of Pain Program**

"Failure to follow a prescribed course of remedial treatment without
good reason is grounds for denying an application for benefits." Brown v.
Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (holding the claimant's failure to
follow prescribed treatments, among other reasons, supported the ALJ's
credibility determination).  The ALJ in this case noted several instances in
which Kuhle has declined recommended treatment, including failure to take
Prozac (for depression) and Prednisone (for pain).  (Tr. 23).  The record
indicates that Kuhle was hesitant to use some medicines which would affect
her depression or make her emotional.  (Tr. 293, 298, 490).  An ALJ should
take into consideration the reasoning behind any non-compliance with
recommended treatment. See Giles v. Barnhart, 368 F. Supp. 2d 924, 946
(N.D. Iowa 2005) (where a woman who had tried many medications to treat
her headaches refused one as recommended because she read it could
cause hair loss was insufficient evidence to discredit her complaints of
pain).

Kuhle had tried numerous medications to relieve her symptoms.
Refusing some medications based on unwanted side effects would not be

unreasonable. These instances do not support the ALJ's finding that Kuhle's statements are not credible.

Kuhle's failure to start the pain clinic program, however, does support the ALJ's finding that Kuhle's statements are not credible.  After considering the entire record and granting the ALJ the deference he is entitled with regard to credibility determinations, the court finds that substantial evidence exists to support the ALJ's findings on Kuhle's credibility.  Kuhle contends that under Holmstrom v. Massanari, 270 F.3d 715 (8th Cir. 2001), the record as a whole corroborates her complaints "in such a qualitative manner as to negate the inconsistencies pointed out by the ALJ." Holmstrom, 270 F.3d at 722.  In Holmstrom, the ALJ issued an opinion on August 17, 1998.  Id. at 717.  Holmstrom then submitted to the Appeals Council supplemental evidence with his request for review.  The Council made the evidence part of the record, but denied the request for review.  Id. Part of the additional evidence that was not considered by the ALJ was a note from an examining physician who noted that Holmstrom was "obviously severely impaired" and prescribed antidepressants to Holmstrom in four times the normal dosage.  Id. at 719.  In addition, the evidence included an MRI from October of 1998 that showed Holmstrom had "advanced degenerative disc and facet disease, a possible disc herniation or bony outgrowth, and neural foramen stenosis." Id. at 720.

In addition to this evidence, Holmstrom had been previously diagnosed with post-traumatic stress disorder stemming from his combat service in Vietnam.  Id. at 719.  His previous MRIs, X-rays, and CT scans showed Holmstrom suffered from narrowed disk spaces, spur formation, degenerative disk disease, and disk bulges or herniations in the lower lumbar and upper sacral region of his spine.  Id. at 718.

Kuhle does not have the overwhelming weight of evidence proving a disability as did Holmstrom.  Not only did Kuhle not suffer from post-traumatic stress disorder, but she also does not have strong medical evidence to corroborate her complaints of pain.

After her surgery, Kuhle's MRI scans and bone scans have been analyzed by several physicians.  None of them could report such dramatic evidence as was submitted in Holmstrom's case.  Dr. Baxter evaluated her MRI and found "a small amount of residual disc . . .  but this does not appear to be causing more than a minimal indentation on the cord.  No significant foraminal narrowing."  He also found no recurrent disk herniations and no residual cord compression.  (Tr. 275).  Dr. Seljeskog found her MRI to be "unremarkable" with only a small disk abnormality.  (Tr. 302).  Dr. Eckrich stated he was at a loss to explain her symptoms, noting that the small disk herniation that was present is now gone.  (Tr. 323).  Dr. Simonson analyzed her MRI and thought perhaps the herniation

was greater than the MRI showed.  (Tr. 293-94).  In a follow-up visit he still could not understand her symptoms because her MRI showed very little thoracic cord lesion.  (Tr. 292).  After obtaining cervical, thoracic, and lumbar MRI scans and a bone scan, Dr. Suga found mild increased uptake in the thoracic spine, some degenerative disk change, but no compressive pathology, and no cord involvement.  (Tr. 387).  Dr. Chang found a small disk herniation, but otherwise found her MRI normal.  (Tr. 366).

Dr. Mehbod found loss of normal disk signal, some disk herniation, and Schmorl's nodules at her endplates.  (Tr. 487).  Overall, Kuhle's record does not contain the heavy weight of medical evidence that persuaded the Holmstrom court to overrule the ALJ's credibility determination.

## CONCLUSION

Recently, the Eighth Circuit addressed a credibility finding where an ALJ had considered the Polaski factors and articulated in his decision those inconsistencies that caused him to discount the claimant's complaints of disabling pain.  Dolph v. Barnhart, 308 F.3d 876 (8th Cir. 2002).  In Dolph the court stated,

> While there is little doubt that [the claimant] experiences pain, the issue in this case is whether the pain is so severe as to be disabling . . . While the record might also support a contrary determination, we conclude that the ALJ's findings and conclusion on this issue are supported by substantial evidence viewing the administrative record as a whole.

Id. at 880.

The ALJ did not err in his decision to discount Kuhle's subjective complaints of pain. The ALJ considered the Polaski factors, explained his credibility findings, and gave multiple valid reasons for finding Kuhle not entirely credible.  Substantial evidence in the record exists to support the Commissioner's decision that Kuhle did not meet the disability requirements of the Social Security Act prior to June 6, 2005.  Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Kuhle's claim for disability insurance benefits is affirmed.

Dated July 25, 2006

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE